AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

### for the
### Western District of Washington

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
Comcast account r3kchow@comcast.net

)
)
)
)
)
)

Case No.   MJ23-194

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is incorporated herein by reference

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 951; 22 U.S.C. 611 et seq.; 18 USC 371 | Agent of a Foreign Government; Foreign Agents Registration Act Conspiracy |

The application is based on these facts:

✓  See Affidavit of Special Agent Brandon Tower continued on the attached sheet.

☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Brandon Tower, Special Agent, FBI
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   _____ 04/28/2023 _____

_____
*Judge's signature*

City and state:  Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

STATE OF WASHINGTON      )       ss
                                                )
COUNTY OF KING              )

I, Brandon Tower, being first duly sworn, hereby depose and state as follows:

## AFFIANT BACKGROUND

I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since October 2019. I have been trained by the FBI to investigate federal criminal activity and to protect the security interests of the United States ("U.S."). Since March 2020, I have been assigned to a squad focusing on intelligence threats from the People's Republic of China ("PRC"). As an FBI Special Agent, I have training in the preparation, presentation, and service of criminal complaints and arrest and search warrants. Prior to joining the FBI, I was a criminal prosecutor in the Suffolk County District Attorney's Office in Boston, Massachusetts for five years.

This affidavit is intended to show only there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. The facts and information in this affidavit are based upon my participation in the investigation, my review of records of others participating in the investigation, my training and experience, and information from other agents, witnesses, and agencies. Unless specifically indicated, all statements of myself or others in this affidavit are summarized in substance and in part. Unless specifically indicated, all dates, times, or numbers are approximate.

## PURPOSE OF AFFIDAVIT

I make this affidavit in support of an application for a search warrant for information associated with email account r3kchow@comcast.net (the "Subject Account") that is stored at premises owned, maintained, controlled, or operated by Comcast Communications LLC ("Provider"), an e-mail provider headquartered at 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania, 19103. The information to be searched is

described in Attachment A. This affidavit is made in support of an application for a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require the Provider to disclose to the government copies of the information (including the content of communications) relating to the Subject Account, as described further in Section I of Attachment B. Government-authorized persons will review that information to locate the items described in Section II of Attachment B.

Based on the facts set forth in this affidavit, there is probable cause to believe that Ronald Shuki Chow committed violations of Title 18, U.S. Code, Section 951 (Agents of Foreign Governments), Title 22, U.S. Code, Section 611 *et seq.* (Foreign Agents Registration Act) and Title 18 U.S. Code, Section 371 (Conspiracy) (collectively, "Subject Offenses"), and that evidence of those violations will be found in the Subject Account.

## SUMMARY OF LAWS UNDERLYING THE SUBJECT OFFENSES

Section 951 of Title 18 of the U.S. Code makes it a criminal offense for any person, other than a diplomatic or consular official or attaché, to act in the U.S. as an "agent of a foreign government" without prior notification to the Attorney General, which generally takes the form of submitting a letter or written notice. For purposes of Section 951, the term "agent of a foreign government" includes an individual who agrees to operate within the U.S. in any manner that is subject to some form a direction or control of a foreign government or official. Activities and conduct that are covered by Section 951 include gathering information, conducting research on a given topic, engaging in some form of observation or surveillance of identified persons or groups, or attending social or political events and reporting back to the foreign government or official.[1]

The Foreign Agents Registration Act ("FARA") prohibits any person from acting "as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement . . . or unless he is exempt from registration . . . ." 22 U.S.C. § 612(a). FARA's purpose is to facilitate the government's and the American people's

---

[1] Section 951(d) includes several exceptions including: "(2) any officially and publicly acknowledged and sponsored official or representative of a foreign government…(4) any person engaged in a legal commercial transaction."

evaluation of the statements and activities of such persons in light of their function as foreign agents. The statute requires persons working on behalf of foreign governments or other foreign principals (including U.S. citizens outside the U.S. who are not otherwise domiciled within the U.S.) to disclose their relationship to foreign principals and information about their activity.

The term "agent of a foreign principal" is in turn defined, in relevant part, as "any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person (i) engages within the United States in political activities for or in the interests of such foreign principal; (ii) acts within the United States as a public relations counsel. . . or political consultant for or in the interests of such foreign principal; (iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or (iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States . . . ." 22 U.S.C. § 611(c)(1).

Under FARA, "political activities" are defined to include "any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relation of a government of a foreign country or a foreign political party." 22 U.S.C. § 611(o). FARA defines the term "political consultant" to mean "any person who engages in informing or advising any other person with reference to the domestic or foreign policies of the United States or the political or public interest, policies, or relations of a foreign country or of a foreign political party." 22 U.S.C. § 611(p).

Affidavit of Special Agent Brandon Tower - 3
USAO# 2023R00163

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## SUMMARY OF PROBABLE CAUSE

2

### A. Background on Ronald Chow.

3   Ronald Shuki Chow ("Chow") is a naturalized U.S. citizen from Hong Kong who

4   currently resides in Washington State. Chow is a businessperson who has multiple

5   restaurant business agreements, including on U.S. military bases Joint Base Lewis-

6   McChord, in Washington State, and Ramstein Air Base, in Germany.

7   For over a decade, Chow has been a prolific networker, establishing connections

8   with U.S. government employees at the federal, state and local level. Chow has direct

9   access to many elected officials and is persistent in his efforts to maintain relationships

10   with these officials and their staff. In part, Chow has cultivated these relationships by

11   making campaign contributions to both Democratic and Republican candidates for political

12   office.[2]

13   Concurrent with these efforts, Chow maintains a substantial and long-standing

14   relationship with the PRC Consulate in San Francisco ("PRCCONSF"). Because the

15   PRCCONSF is the PRC consulate physically closest to Washington State, PRCCONSF

16   diplomats handle official business in the Pacific Northwest. The PRCCONSF relies on

17   Chow to assist them with matters in Washington State, with Chow self-identifying as an

18   unpaid liaison to the PRCCONSF in Washington.

19   Based on an FBI investigation into Chow's activities on behalf of the PRCCONSF,

20   and the PRC Government more broadly, there is probable cause to believe Chow's efforts

21   constitute violations of FARA and Section 951.

22   ### B. Chow pressures U.S. officials and U.S. businesses on issues of interest to the
23   PRC government.

24   On several occasions, Chow has sought to influence U.S. officials and U.S.

25   businesses on matters of policy significance to the PRC, including the U.S.' "One China

26   Policy" and non-recognition of Republic of China ("Taiwan").

27

28

---

[2] A review of public campaign contribution filings show that since 2005, Chow has made nearly $40,000 in donations to political candidates. Chow's most recent contribution was in March 2023.

An FBI Confidential Human Source ("CHS 1")[3] stated that in 2009, a Taiwanese diplomat invited Washington State Official 1 to visit Taiwan. In response, the PRC Government sent a letter threatening to cut-off trade with Washington State if Washington State Official 1 accepted Taiwan's offer. Chow met directly with Washington State Official 1 and instructed them that they should not go to Taiwan, and that if they did, it would "piss off" the PRC Government.[4] Washington State Official 1 decided against traveling to Taiwan. As consolation, the PRC Government "made it up" to Washington State Official 1 by sending them and their spouse to Tibet.[5]

In early 2016, a prominent wholesale conglomerate ("Wholesaler 1"), informed a Taiwanese independence advocacy group that they had begun the process of changing their website to have Taiwan listed as a country. When this forthcoming change became public, it prompted numerous Chinese citizens to threaten a boycott of Wholesaler 1 if they recognized Taiwan as a country. As Wholesaler 1 considered how to respond to criticisms from the Chinese community, their Executive Vice President ("EVP") was contacted by Chow about the matter.

On August 19, 2016, and December 14, 2022, the FBI interviewed Wholesaler 1 EVP. The EVP stated that during the controversy, they were emailed by Chow. The FBI obtained copies of the email correspondence between the EVP and Chow which reads as follows:

> Dear [EVP],
>
> My name is Ron Chow, I was contacted by the Chinese Consulate General Office in San Francisco to ask to make contact with [Wholesaler 1].
> Would like to meet with you at your office when your time is permitted.
> The meeting will be short and it will only require no more than 15 minutes.

---

[3] CHS 1 provided information to the FBI about this investigation on multiple occasions, including prior to being a CHS for the FBI. To ensure continuity, I have referred to this individual as "CHS 1" throughout the affidavit, even if the information was provided before CHS 1 was reporting in the capacity of a CHS.

[4] CHS 1 told the FBI that Washington State Official 1 viewed Chow as a liaison to the PRC, but not necessarily a representative of their government.

[5] While Washington State Official 1 did not travel to Taiwan, members of their staff, as well as other state and local officials, did. Chow also traveled with this delegation to Taiwan.

1
2
3
4

Looking forward to hear back from you soon.

Sincerely,
Ron Chow
Liaison
Chinese Consulate General Office in San Francisco for State of Washington

5
6
7
8
9
10
11
12

During one of the FBI interviews, the EVP stated they subsequently arranged a meeting with Chow. During the meeting, Chow outlined China's policy regarding Taiwan and stressed Wholesaler 1 needed to change Taiwan back to a province on their website. Chow stated he was aware of Wholesaler 1's plans to expand into China in the fall of 2016, and that Wholesaler 1's actions could prevent them from doing business in China. When Wholesaler 1 ultimately declined to list Taiwan as a country on their website, Chow invited the EVP to have dinner with the PRCCONSF Consulate General ("CG") so the CG could express his gratitude for fixing the problem.

13
14
15
16
17
18
19

The FBI obtained additional information about Chow's efforts to influence U.S. officials with respect to the issue of Taiwan during an interview of Washington State Official 2. Washington State Official 2 stated that upon taking office in January or February of 2022, Chow arranged for Washington State Official 2 to take a phone call from the PRCCONSF CG. On the call, the CG gave Washington State Official 2 a "hard pitch" about the U.S.' relationship with Taiwan. The CG advised Washington State Official 2 not to travel to Taiwan and implored them to adhere to the One China Policy.

20
21
22
23
24
25
26
27

Washington State Official 2 also told the FBI they attended multiple events in September or October of 2022. The first event celebrated China National Day and was attended by Chow and the PRCCONSF Deputy CG.[6] When Washington State Official 2 arrived, Chow insisted Washington State Official 2 take pictures with the Deputy CG, and sat them next to each other. The Deputy CG addressed the room in Mandarin and gave a speech entirely about Taiwan.[7] The Deputy CG advocated for a return to the One China Policy and expressed the unfortunate nature of the tensions between the U.S. and the PRC

28

---

[6] Washington State Official 2 was invited to the event by its organizer, who was not Chow
[7] A male sitting next to Washington State Elected Official 2 provided a rough translation of the speech.

Affidavit of Special Agent Brandon Tower - 6
USAO# 2023R00163

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

over the issue. Chow later threw Washington State Official 2 a well-attended fundraising event.

Washington State Official 2 also told the FBI that in or around October 2022, Chow called their office, although it is unknown whether Chow spoke to the elected official or to their campaign manager. During the call, Chow stated that Washington State Official 2 should not attend Taiwan National Day, as this would anger the Chinese.

### C. Chow's role as a "liaison" to the PRC Consulate in San Francisco.

Chow overtly acts as a representative of the PRCCONSF, serving as their liaison in Washington State.  For more than a decade, Chow has brought delegations of U.S. officials to the PRC to meet with the PRC Government. Chow also arranges meetings and phone calls between PRC diplomats working in the U.S., and U.S. officials. In carrying out these tasks, Chow provides personal services to the PRCCONSF, using his personal vehicle to drive PRC Government officials to meetings, making their travel reservations, and conducting official business on their behalf. While Chow has denied receiving compensation for this work on behalf of the PRCCONSF, in my training and experience, Chow may still benefit materially from the services he provides. I understand that in China, people seek compensation in the form of "guanxi,"[8] or the implied obligation to provide reciprocal favors.  This form of social currency does not take the form of formal contracts, but nonetheless leads to future material benefits.

According to records of official proceedings and open sources, in 2011, Local Official 1[9] asked for Chow's frequent-flyer miles so they could be used to purchase round-trip airfare, valued at over $1,000, to the PRC. Chow gave Local Official 1 the miles as requested and accompanied Local Official 1 on their trip through Asia. Later, an ethics oversight board concluded that Local Official 1's acceptance of Chow's miles violated the city's ethics regulations, and Local Official 1 was admonished for the misconduct. Chow

---

[8] 'Guanxi is essentially one's political and social network which provides favors and opens doors.
[9] Local Official 1 is now a Member of the U.S. Congress.

told reporters that Local Official 1 was a sponsored guest, and the miles were not intended as a gift.

In 2015, Chow helped make hotel arrangements for a delegation of PRC Government officials visiting Seattle in August and September of the same year. The FBI obtained records from the hotel that hosted the Chinese officials ("Hotel 1"). One of the records obtained was a contract, dated July 31, 2015, between Hotel 1 and the Chinese Consulate General, Consul Liu Zhen. The contract purchased over $50,000 of services from Hotel 1, and was signed, "Ron Chow for Liu Zhen". The FBI obtained another record from Hotel 1, dated September 20, 2015, which stated Chow made arrangements with Hotel 1 on behalf of Sun Can, a Consul with the PRCCONSF. Hotel 1's records also included a "Namelist" of PRCCONSF employees, which listed Ron Chow as "Staff". Based on my review of all the records obtained from Hotel 1, I believe these arrangements were made in support of PRC President Xi Jinping's visit to Seattle that began the next day on September 21, 2015.[10]

On December 1, 2016, the FBI interviewed an agent of U.S. Customs and Border Protection ("CBP"). The CBP agent stated Chow contacted CBP in 2015, and held himself out to be an unofficial representative of the PRCCONSF. On multiple occasions, Chow requested "assistance" from CBP for a PRC Government delegation that was visiting the U.S. Chow made one such request in September 2015, in connection with a trip by PRC President Xi Jinping to Washington State. The CBP agent was unsure what Chow meant by providing "assistance," but assumed Chow sought expedited screening for visitors traveling on Official or Diplomatic Passports.

On April 17 and May 11 of 2017, the FBI interviewed a member of the Washington State Army Community Council ("WSACC"). The WSACC representative knew Chow and stated Chow provided their supervisor a business card. The card read as follows:

---

[10] Chow's September arrangement with the hotel was ultimately terminated by the hotel. Chow was trespassed from the premises after making threatening comments to hotel staff.

Ron Chow
Friendship Representative for State of Washington
Sichuan Provincial Government
People's Republic of China

Thus, by using the card, Chow appears to have held him out as a representative of the Sichuan Provincial Government in China, which suggests Chow has a direct relationship with PRC government entities in China in addition to his relationship with the PRCCONSF. During the interview with FBI, the WSACC member stated they believed Chow was the "unofficial consulate for China." The WSACC member also explained that Chow accompanied local Washington officials on travel to the PRC, which they believed Chow did without compensation from the PRC Government. The WSACC representative also stated that Chow had previously represented PRC Nationals who were arrested or detained by U.S. law enforcement.[11]

### D. Chow provides "Consular Protection" services to PRC citizens held at ICE detention centers, including PRC national who recants asylum claim.

On November 20, 2017, the FBI interviewed a supervisory official with Immigration and Customs Enforcement ("ICE"). The ICE official stated Chow had visited PRC detainees being held at the ICE detention center in Washington. The ICE official further shared their belief that Chow engaged with the detainees at the request of and on behalf of the PRCCONSF.

By way of example, the ICE official detailed one instance in November 2017, involving a PRC citizen named Bosheng Chen ("Chen") who was detained at the Seattle-Tacoma International Airport after CBP found ballistic body armor and a pistol holster in his baggage.[12] During an interview with CBP that same day, Chen requested asylum, stating he feared for his life if he were returned to China. Chen later withdrew his asylum

---

[11] Even if Chow had no relationship to the PRCCONSF, he would have been able to meet with the individuals detained by law enforcement as a member of the public.

[12] Chen claimed he purchased the holster to use at a shooting range.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

claim and was scheduled for deportation back to the PRC. I am currently unaware whether Chen was in fact returned to China.

When asked about Chen in a subsequent interview with the FBI, Chow confirmed that, at the request of the PRCCONSF, he had twice met with Chen at the ICE detention center in Washington, during Chen's three weeks of detention.

Several years later, on November 27, 2019, the FBI interviewed a private citizen who resided in Issaquah, Washington. The individual stated that the week prior, a man claiming to be a volunteer for the PRC Consulate came to their home to ask about an old roommate. The individual showed the FBI a picture of the man's business card, which was observed to read "Ron Chow, Liaison, Consular Protection." Thus, it appears Chow has, for at least several years, held himself out as holding an official position with the PRC Consulate.

### E. Chow's relationship with and work for the PRCCONSF likely remains ongoing.

In late-July 2022, PRCCONSF CG Zhang Jianmen ("CG Zhang") and members of his staff traveled to the Seattle, Washington area. During CG Zhang's trip, the FBI observed Chow providing the PRC delegation logistical assistance. Chow appeared to act as the delegation's chauffeur, regularly using his personal car to drive the delegation to official meetings and then to transport gifts the delegation provided.

Per established diplomatic protocol, the PRCCONSF submitted an Engagement Approval Request to the State Department Office of Foreign Missions. The request notified the U.S. Government that CG Zhang intended to meet with several officials during CG Zhang's trip to Seattle, including the following:

- Washington State Official 2
- Washington State Representative 1
- Washington State Senator 1
- Local Official 2
- Local Official 3
- Local Official 4

Affidavit of Special Agent Brandon Tower - 10
USAO# 2023R00163

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    As detailed below, through interviews with some of these public officials, the FBI
2    has learned that Chow was instrumental in orchestrating CG Zhang's schedule.

3    On or about July 22, 2022, Washington State Official 2 met with the PRC
4    delegation. Thereafter, the FBI interviewed Washington State Official 2, who stated the
5    meeting had been arranged by Chow, who attended the meeting, in addition to CG Zhang
6    and two other staffers. According to Washington State Official 2, CG Zhang tried to "butter
7    up" Washington State Official 2, by encouraging Washington State Official 2 to run for
8    governor. The CG's only request of Washington State Official 2 was to come to China.
9    The CG did not raise any topics of substance.

10   On July 24, 2022, Washington State Senator 1 met with the PRC delegation.
11   Thereafter, the FBI interviewed Washington State Senator 1, who stated the meeting was
12   arranged by Chow, who attended the meeting. According to Washington State Senator 1,
13   during the meeting, CG Zhang focused primarily on trade matters and advocated that the
14   U.S. Government repeal tariffs, presumably to include tariffs imposed on U.S. goods
15   exported to China.

16   On July 25, 2022, Local Official 2's Deputy met with the PRC delegation.
17   Thereafter, the FBI interviewed the Deputy, who stated the meeting was arranged by Chow,
18   who attended the meeting. According to Local Official 2's Deputy, during the meeting, CG
19   Zhang focused on the PRC Government's relationship with the U.S. Federal Government
20   and sought assistance from Local Official 2's office to strengthen their relationship with
21   the Biden Administration.[13]

22   In November 2022, the FBI interviewed CHS 1. CHS 1 told the FBI that,
23   historically, Washington State Official 2's office played a role in managing the state's
24   relations with foreign governments. While the office's previous elected official was
25   uninterested in international relations, Washington State Official 2 was willing to engage.
26   According to CHS 1, Chow was excited by the change in policy.

27

28   [13] The FBI has not yet interviewed Washington State Representative 1, Local Official 2, Local Official 3 or Local Official 4.

Affidavit of Special Agent Brandon Tower - 11
USAO# 2023R00163

During an interview with the FBI, CHS 1 stated Chow has been engaged with Washington State Official 2's office across multiple administrations. Additionally, CHS 1 stated that an office staffer had previously traveled with Chow to China, as part of a U.S. delegation, on three occasions. CHS 1 was unsure who financed each trip, but believed they were all paid for by the PRC Government. Finally, CHS 1 stated that, at the time of the FBI interview, Chow had been calling and texting a staffer every day about setting up a Zoom call between the PRCCONSF CG and Washington State Official 2 to acknowledge the 40-year anniversary of the sister pairing between Sichuan Province and Washington State. According to CHS 1, Chow had become "very pushy" and insisted that he (Chow) join Washington State Official 2 in person during the call.

### F.  Law enforcement interviews of Chow.

Federal law enforcement has interviewed Chow on multiple occasions. During these interviews, Chow has admitted to some involvement with the PRCCONSF. Thus, the interviews, as summarized below, confirm Chow's involvement with the PRCCONSF.

On October 28, 2016, CBP interviewed Chow. Chow informed CBP he had been working with the Chinese Government for over 30 years, but did not receive any compensation for it.

On February 24, 2017, the FBI conducted a voluntary interview of Chow at the FBI Seattle Field Office. Chow provided the following information about his work with the PRC Government:

- Chow acknowledged and was proud of his association with the PRCCONSF. Chow advised he has been volunteering for the PRCCONSF for 10 to 12 years as their "Unofficial Liaison." Because of the distance from San Francisco, the PRCCONSF cannot regularly fly officials to Seattle to handle routine and emergency consular matters. Chow became involved with PRCCONSF officials after receiving a request from the then-serving CG. The PRCCONSF knew Chow had many connections.

- Chow does not receive any compensation from the PRCCONSF. Chow performs the work because of the reward and satisfaction in helping others. Chow claimed he did not receive any credentialing from the PRCCONSF, not even business cards.

Affidavit of Special Agent Brandon Tower - 12
USAO# 2023R00163

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- As part of being the "Unofficial Liaison" for the PRCCONSF, Chow frequently visits Chinese nationals detained on immigration matters. Chow will ask the detainee if they need an attorney, if they require medical attention, and whether they have been treated appropriately. Chow then reports the information back to the PRCCONSF. Detention center officials know that Chow is the go between and allow him access to detainees. Once a year, PRCCONSF officials visit the detention center and vouch for Chow.

- When Chinese nationals are arrested, involved in accidents, or missing, the PRC Government needs answers right away. According to Chow, the PRCCONSF relies on Chow to get the information PRC parents demand.

- Chow helps the PRCCONSF meet with high-level elected federal, state and local officials. Chow stated he was willing to do the work of building relationships, and it has paid off in his access to politicians. Chow will help obtain Chinese visas for Washington dignitaries.

- Chow has brought over twenty Washington state legislators to visit China. For example, he took U.S. Congressperson 2 to China back in 2002, and arranged for them to meet with the Chinese Premier. The PRC Government will not pay the cost for U.S. politicians to visit China.[14]

- In 2015, Chow helped to coordinate the visit of PRC President Xi to Seattle. Chow was responsible for spearheading the invitation by the PRC Government for 100 students from Tacoma's Lincoln High School to take a trip to China. One year later, Chow accompanied the students on the trip.

During the same interview, Chow was asked about $17,000 worth of campaign contributions that were made on a single day in 2013. The donations, all made to U.S. Congressperson 3, were made in the names of Chow, his wife, his son, and a close friend. Chow was confronted with four corresponding cashier's checks, all made payable to "PEOPLE FOR [U.S. Congressperson 3]," totaling $17,000. Chow admitted to using funds from his checking account to purchase some of the cashier's checks, and that all checks

---

[14] Chow's statements here appear inconsistent with statements made by CHS 1, discussed *supra*, who suggested the travel costs for U.S. elected officials were covered by the PRC government. At this point in the investigation, your affiant is unable to conclusively assess which statement is true.

Affidavit of Special Agent Brandon Tower - 13
USAO# 2023R00163

were given as donations to U.S. Congressperson 3's campaign. Chow claimed he was receiving reimbursements from the individuals whose names were attached to the donations, but could not provide any documentation to substantiate that claim.

On September 20, 2017, the FBI interviewed Chow at McCarran International Airport in Las Vegas, Nevada. Chow had returned from a two-week trip to China accompanying Washington State Official 3 to Sichuan Province. Chow stated he served as a liaison and interpreter for Washington State Official 3 when they met with PRC officials, including the Vice Governor of Sichuan Province.

On April 10, 2018, the FBI again interviewed Chow. Chow discussed the PRCCONSF's request for him to meet with Chen at the detention center in 2017, noting he had received specialized consular protection services training at a "diplomatic college" in China. Chow further explained that the Chinese Government could dispatch him to a foreign country to provide consular protection services. Chow denied the PRC Government paid for the training or that he received any compensation for his consular protection work. Chow stated he provided this help because he enjoyed it and because China had no official diplomatic presence in Washington State.

### G. FARA Unit notifies Chow of potential obligations to register as foreign agent.

FARA requires the registration of agents of foreign principals who are engaged in political activities or other activities as specified under FARA. Chow's activities on behalf of the PRC, specifically, his lobbying of U.S. government officials to avoid travel to Taiwan and to adhere to the "One China Policy," led U.S. Department of Justice ("DOJ") officials to advise him on multiple occasions of his potential need to register as an agent of the PRC Government.

During the February 2017 interview, the FBI discussed FARA registration with Chow. Chow claimed he did not need to register and said he did not want anyone to "own" him.

Affidavit of Special Agent Brandon Tower - 14
USAO# 2023R00163

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

On or about February 2, 2021, the FBI informed Chow he might need to register under FARA based on a review of the information he provided during his interviews with the FBI. Chow asserted he never received compensation for his work and therefore did not need to register, although monetary compensation is not an element of the FARA statute. Agents advised Chow to contact the DOJ's FARA Unit, and Chow agreed to work with professionals to resolve the matter.

On March 26, 2021, the DOJ FARA Unit sent a Letter of Inquiry ("LOI") to Chow seeking information to determine if Chow had an obligation to register under FARA. The LOI cited two online articles identifying Chow as a representative and spokesperson for the PRCCONSF, and as an attendee of a meeting with the PRCCONSF CG. The letter asked Chow to explain his activities on behalf of the PRC and to include a certification that the information provided in response was true, correct, and complete.

On April 20, 2021, Chow responded to the LOI. Chow did not certify the accuracy of the information, nor did he provide an affirmative statement that he produced all relevant information and documents in his possession. Specifically responding to a request for details of services Chow has provided the PRC Government, Chow stated the following:

> The activities I have been engaged or rendered were helping Chinese citizens in times of crisis in the State of Washington… Making appointments for elected officials for PRCCONSF if requested is the only thing I do besides that.

Elsewhere in his response to DOJ, Chow denied having had any "emails/communications" with PRCCONSF in years. The FARA Unit never responded to Chow's LOI response.

Based on the FBI's investigation, I believe Chow's response to DOJ was materially false. As enumerated throughout this affidavit, the FBI is aware that Chow has provided substantial services to PRC Government officials, including providing consular protection, signing agreements on its behalf, and lobbying leaders in both the public and private sector.

According to checks of its database by the FARA Unit on February 8, 2023, Chow has not registered under FARA, or notified the Attorney General pursuant to 50 U.S.C. § 851. Nor has Chow notified the Attorney General via the National Security Division

Affidavit of Special Agent Brandon Tower - 15
USAO# 2023R00163

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   pursuant to 18 U.S.C. § 951, and 28 C.F.R. § 73.3(a), that he has been acting as an agent

2   of a foreign government.

3       **H. Chow's use of the Subject Account.**

4       In furtherance of Chow's efforts on behalf of the PRC Government, Chow uses

5   email account r3kchow@comcast.net to arrange meetings on behalf of PRC Government

6   officials, establish his bona fides with the PRCCONSF, and lobby on the issue of Taiwan.

7   The FBI obtained the following information regarding the target account:

8   - Within the records obtained from Hotel 1, there are multiple instances where the
9     contact information for an official of the PRCCONSF lists the Subject Account. For
      example, the FBI reviewed a record, dated August 4, 2015, that listed
10    r3kchow@comcast.net as the email address for the account of Liu Zhen of the
11    Chinese Consulate General Office.

12  - During the April 2016 incident with Wholesaler 1, Chow used the Subject Account
13    to contact the EVP. In the April 27, 2016 email, Chow stated he was tasked by the
14    PRCCONSF to speak with Wholesaler 1 and identified himself as a liaison for the
      PRCCONSF.
15

16  - During the FBI's December 2016 interview of the CBP agent, they stated Chow was
17    requesting assistance for a visiting delegation from the PRC Government. Chow
      claimed he was an unofficial representative of the PRCCONSF and provided them
18    the Subject Account.

19  - During the FBI's May 2017 interview, the WSACC representative stated the
20    business card Chow provided listed the following information:
21
22        - Ron Chow
          - Friendship Representative for State of Washington
23        - Sichuan Provincial Government
          - People's Republic of China
24        - Phone: 253.640.7601
25        - E-mail: r3kchow@comcast.net (the Subject Account)

26  - During the FBI's July 2022 interview of Local Official 2's Deputy, they reported
27    Chow arranged the meeting with CG Zhang by email.

28

- CHS 1 stated that on or about November 17, 2022, Chow used Subject Account to email letters from CG Zhang to Washington State Official 2 and Washington State Official 4. The letters generally expressed an intent to maintain positive diplomatic relations. Later in 2022, Chow used the Subject Account to email a proposed "Memorandum of Understanding on Strengthening Friendship Relations between the State of Washington… and the Province of Sichuan" to be signed by Washington State Official 2 and the Executive Vice Governor of Sichuan Province.[15]

- During the FBI's January 20, 2023, interview of Washington State Senator 1, they informed that Chow's email address was the Subject Account.

- The FBI received a copy of a recent email sent by Chow to a staffer for Local Official 2. On January 26, 2023, Chow emailed the staffer to arrange a meeting between Local Official 2 and CG Zhang. Chow used the Subject Account to send the email and cc'd the PRCCONSF Director of the Political and Press Section.

## BACKGROUND ON COMCAST COMMUNICATIONS LLC

Based on the investigation in this case, I have learned that Comcast Communications LLC ("Comcast") provides email access to subscribers. Comcast allows subscribers to obtain email accounts like the Subject Account. During the process of obtaining and maintaining an account the email service provider asks the subscriber to provide information on the user or users of the account and/or the party to be billed for the account, if there is a fee. Therefore, the data storage facilities of Comcast are likely to contain stored electronic communications (including retrieved and unretrieved emails for subscribers) and information concerning subscribers and their use of email services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the Subject Offenses because the information can be used to identify the account's user or users and the party or parties who pay for the use of the account(s).

---

[15] CHS 1 did not have the emails from Chow in their possession at the time of the interview, but CHS 1 affirmatively stated they believed Chow used the Subject Account to send these emails because they have never known him to use any other email account.

In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the Subject Offenses because the information can be used to identify the account's user or users.

In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in times and durations, the types of services utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP Address") used to register the account and the IP addresses associated with the particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help identify which computers or other devices were used to access the email account.

//
//
//
//
//
//
//
//
//
//

Affidavit of Special Agent Brandon Tower - 18
USAO# 2023R00163

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **REQUEST FOR SEALING**

It is respectfully requested that this Court issue an order sealing all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the warrant is relevant to an ongoing investigation, and not all the targets of this investigation will be searched at this time. Furthermore, the targets are not aware of the investigation, or at least of the full scope of the investigation. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet and disseminate them to other criminals as they deem appropriate. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. It could cause some targets to flee or avoid returning to the U.S., to destroy or tamper with evidence, to intimate other potential witnesses, or otherwise seriously jeopardize the investigation.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

Affidavit of Special Agent Brandon Tower - 19
USAO# 2023R00163

## CONCLUSION

Based upon the information set forth above, I respectfully submit that there is probable cause to search the Subject Account described in Attachment A for records and information to be seized and searched, as described further in Attachment B.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

BRANDON TOWER, Affiant
Special Agent, FBI

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on the  28th  day of April, 2023.

HONORABLE MARY ALICE THEILER
United States Magistrate Judge

Affidavit of Special Agent Brandon Tower - 20
USAO# 2023R00163

## <u>ATTACHMENT A</u>

### Comcast account to be searched

The electronically stored information and communications contained in, related to, and associated with, including all preserved data associated with Comcast account:

**r3kchow@comcast.net**

as well as all other subscriber and log records associated with the account, which are located at premises owned, maintained, controlled, or operated by Comcast Communications LLC, an e-mail provider headquartered at 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B

## Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Comcast Communications LLC ("Comcast"), including any emails, records, files, logs, or information that has been deleted but still available to Comcast, or has been preserved pursuant to a request made under Title 18, U.S. Code, Section 2703(f), Comcast is required to disclose the following information to the government for each account listed in Attachment A:

a.     The contents of all e-mails associated with the account from January 1, 2015, through the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.     All records of connected Comcast services with the electronic email account stored at any time by an individual using the account, including address books content, contact lists content, calendar data content, stored digital files (including backups of any apps stored), maps, photos, search query content, web & activity content, location history content, digital advertisement content, social media profile content, digital data back-ups, and third-party application data; and

ATTACHMENT B

e.      All records pertaining to communications between the provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.    Information to be Seized by the Government**

Information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18, U.S. Code, Section 951 (Agents of Foreign Governments), Title 22, U.S. Code, Section 611 *et seq.* (Foreign Agents Registration Act), and Title 18 U.S. Code, Section 371 (Conspiracy), those violations involving Ron Chow, and others known and unknown, and occurring on and after January 1, 2015, that is, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      Evidence related to:

- Communications to and from any email account associated with the PRCCONSF and its agents;
- Communications with officials from either the U.S. or PRC Governments and/or their staff;
- Communications attempting to arrange meetings and/or travel on behalf of government officials and/or business executives;
- Communications involving Chow's affiliation, association and/or work on behalf of the PRCCONSF or the PRC Government;
- Any taskings, orders, directives or requests Chow has received by the PRCCONSF and/or the PRC Government, including any communications showing Chow acting as their agent;
- Chow's efforts to engage in political activities of interest to a foreign government, including the PRC;
- Discussions of 1) government policy related to Taiwan, 2) the One China Policy, 3) the recognition/non-recognition of Taiwan as a country, and/or 4) discouraging potential travel to Taiwan;
- Discussions of financial contributions to candidates for elected office;

ATTACHMENT B

- Chow's credentials as a representative of the PRCCONSF, including business cards, certificates, diplomas, or other documents evidencing Chow's relationship with the PRCCONSF;
- Chow's work providing "Consular Protection" services, including representing PRC nationals held at ICE detention centers;
- The detention of Bosheng Chen by ICE, any subsequent immigration proceedings, attempts to arrange for Chen to be returned to the PRC, and efforts to pressure Chen to retract his asylum claim; and
- The Foreign Agents Registration Act, Chow's awareness of its mandates and any acts and/or omissions taken because of them;

b.      Evidence relating to who created, used, or communicated with the account, including records about their identities and whereabouts;

c.      Evidence indicating how and when the Comcast account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the Subject Offenses and to the account owner;

d.      Evidence identifying the Android, Apple, or other electronic devices linked to the account, including make and model, IMEI or other unique numbers identifying any device;

e.      Content that serves to identify any person who uses or accesses the Comcast account or who exercises in any way any dominion or control over the account, including records that help reveal the whereabouts of such person(s);

f.      Information identifying accounts that are linked or associated with the Comcast account;

g.      Any address lists, contact lists or other lists associated with the specified account that may identify co-conspirators;

h.      All subscriber records associated with the specified account, including name, address, local and long distance telephone connection records, or records of session times and durations, length of service (including start date) and types of service utilized, telephone

ATTACHMENT B

1   or instrument number or other subscriber number or identity, including any temporarily

2   assigned network address, and means and source of payment for such service) including any

3   credit card or bank account number;

4        i.   Any and all other log records, including IP address captures, associated with

5   the specified account; and

6        j.   Any records of communications between Comcast, and any person about

7   issues relating to the account, such as technical problems, billing inquiries, or complaints

8   from other users about the specified account.  This is to include records of contacts between

9   the subscriber and the provider's support services, as well as records of any actions taken by

10  the provider or subscriber as a result of the communication.

11

12       Law enforcement personnel (who may include, in addition to law enforcement

13  officers and agents, attorneys for the government, attorney support staff, agency personnel

14  assisting the government in this investigation, and outside technical experts under

15  government control) are authorized to review the records produced by the Provider in order

16  to locate the things particularly described in this Warrant.

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT B